**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **AMY MORRIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:22-cv-00931** |
| | ) | **Judge Aleta A. Trauger** |
| **ReVIDA RECOVERY CENTERS, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Plaintiff Amy Morris filed this lawsuit in November 2022 against defendant ReVIDA Recovery Centers, LLC ("ReVIDA"), asserting a single claim of retaliation in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h) ("FCA"), based on her alleged demotion shortly after the August 2022 unsealing of a *qui tam* FCA lawsuit Morris and another ReVIDA employee had initiated against ReVIDA in April 2020. (Complaint, Doc. No. 1.) Morris filed a First Amended Complaint ("FAC") in January 2023 to include a second retaliation claim, alleging that she had been fired in December 2022 a few weeks after ReVIDA learned that she had filed this lawsuit. (Doc. No. 31.) ReVIDA filed an Answer and Counterclaim (Doc. No. 32), denying liability, and asserting counterclaims against Morris for (1) breach of fiduciary duty, (2) conversion, and (3) breach of contract. The counterclaims all arise from Morris's allegedly emailing to her private email address "hundreds" of documents and emails containing ReVIDA's confidential information, attorney-client privileged information, and personal health information belonging to ReVIDA clients and protected by HIPAA, unrelated to the *qui tam* complaint.

Now before the court is ReVIDA's Motion for Summary Judgment, seeking judgment in its favor on Morris's FCA retaliation claims, as well as on its own counterclaims. (Doc. No. 53.) ReVIDA's motion is supported by a Memorandum of Law (Doc. No. 54), Statement of Undisputed Material Facts ("SUMF") (Doc. No. 55), and the various exhibits cited in support of its SUMF. Morris has responded with a Memorandum in Opposition to the Motion for Summary Judgment (Doc. No. 56), Response to the SUMF (Doc. No. 56-3), her own "Statement of Undisputed Material Facts" ("plaintiff's SAF") (Doc. No. 56-2), and additional exhibits. The defendant has filed a Reply (Doc. No. 57) and a Response to the plaintiff's SAF (Doc. No. 58).

For the reasons set forth herein, the motion will be granted in part, with respect to the plaintiff's FCA retaliation claim based on "demotion" but denied as to plaintiff's FCA retaliation claim based on her termination and denied as to the defendant's counterclaims.

## I.    LEGAL STANDARDS

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence

is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, inter alia, "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials"—that it believes demonstrate the absence of a genuine dispute over material facts. Fed. R. Civ. P. 56(c)(1)(A); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## II.    FACTS AND PROCEDURAL HISTORY[1]

Both parties reference Judge Richardson's opinion in *McLemore v. Gumucio*, 619 F. Supp. 3d 816 (M.D. Tenn. 2021), and "this [c]ourt's Policies and Procedures" in the prefaces to their own statements of fact and their responses to the opposing party's statements. The court notes, as an initial matter, that it generally agrees with Judge Richardson's observation that legal principles are not properly included in Rule 56.01 statements of undisputed material fact (or statements of disputed additional facts) and that statements of fact should generally be concise. *See id.* at 826; *see also* L.R. 56.01(b).[2] Statements of fact, however, should be *complete*, and they should cover

---

[1] The facts set forth herein for which no citation is provided are derived from the pleadings, the plaintiff's Response to the SUMF (Doc. No. 56-3), and the defendant's Response to the plaintiff's SAF (Doc. No. 58) and are undisputed for purposes of summary judgment. All facts set forth herein are either undisputed for purposes of the defendant's motion or viewed in the light most favorable to the plaintiff, unless otherwise indicated.

[2] The court's Local Rules authorize the party opposing summary judgment on the basis of a material factual dispute to file a "concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there *exists a genuine issue to be*

all of the facts necessary for a party to refute the claims against it and/or prove its own claims. While the court frowns upon unnecessarily lengthy statements of fact, unnecessarily succinct ones are equally unhelpful. A statement of facts should not be so concise as to require the court to search elsewhere in the record to piece together the facts that make up the case and whether they are disputed. Moreover, when facts are included in a supporting memorandum of law (and even supported with record citations) but are not included in the statement of undisputed facts, the party opposing summary judgment does not have the opportunity to clearly notify the court whether those particular facts are disputed. In this case, the defendant included many facts in its Memorandum in support of its Motion for Summary Judgment that are not included in its SUMF, and its Memorandum includes citations to exhibits that are not attached to its SUMF. The court cannot readily ascertain which of these additional facts are disputed and which are not and, unless they are expressly conceded by the plaintiff, has not considered them for purposes of the Motion for Summary Judgment.

A.      The Plaintiff's Employment

Plaintiff Amy Morris is a resident of North Carolina. ReVIDA is a Delaware limited liability company based in Nashville. It is a "behavioral health company focused on treating opioid use disorder." (Doc. No. 32, Answer ¶ 7.) It operates eight outpatient treatment facilities, five in Tennessee and three in Virginia. Its chief financial officer ("CFO") is Evan Norton, and its chief executive officer ("CEO") is Lee Dilworth. During the time at issue in this case, its chief clinical officer was Zachary Talbott.

---

*tried*." L.R. 56.01(c)(3) (emphasis added). There is generally not a need for a non-moving party to point out the existence of additional *undisputed* facts.

Morris was hired as ReVIDA's Director of Quality & Compliance on a part-time basis starting April 1, 2019; she moved into a full-time role beginning May 1, 2019. Throughout her employment, she worked remotely from her home in North Carolina. She was promoted to the position of Chief Compliance Officer in September 2019. (Doc. No. 55-4, at 2 (Sept. 27, 2019 Dilworth email to "All ReVIDA Staff" announcing "promotion"); Doc. No. 55-3, at 6 (Pl.'s Resp. to ReVIDA Interrog. No. 19).) Her job title changed to Chief Quality & Compliance Officer in April 2021. (Doc. No. 55-3, at 6 (Pl.'s Resp. to ReVIDA Interrog. No. 19).) She received a substantial bonus and salary increase in April 2020. (Doc. No. 55-7.) In 2021 and 2022, no Senior Leadership Team member received a raise or bonus, including Morris.

Morris and Talbott, as relators, filed a *qui tam* lawsuit under the FCA against ReVIDA in April 2020, alleging that ReVIDA had engaged in fraudulent Medicaid billing.[3] The complaint was sealed upon filing. After investigating, the federal government declined to intervene, and the *qui tam* complaint was unsealed on August 23, 2022. ReVIDA learned that same day that Morris was a *qui tam* relator.

### B. Alleged Retaliation

The plaintiff alleges that, immediately after the unsealing of the *qui tam* complaint and the revelation that she had filed suit against ReVIDA, the defendant, largely through the acts of CEO Lee Dilworth, began engaging in retaliatory conduct by, for instance: (1) accusing Morris of misappropriating documents by forwarding them to her personal email address; (2) cancelling nearly all of Morris's standing one-on-one Friday meetings (actually telephone calls) with Dilworth; (3) "forcing" Morris to record the company's third-quarter compliance meeting, with only five minutes notice; (4) "confront[ing] her in front of the leadership team during a quarterly

---

[3] Talbott appears to have separated from ReVIDA during the summer of 2020.

compliance meeting to ask if she was aware of any compliance concerns; (5) excluding her from "all company discussions relating to new agencies, mergers, and acquisitions"; and (6) excluding her from a monthly operations call. (*See* FAC ¶¶ 36, 39–43.) Morris was terminated on December 5, 2022, just three weeks after she initiated this lawsuit on November 15, 2022. She alleges that her termination was in retaliation for both the *qui tam* lawsuit and this lawsuit. (*Id.* ¶¶ 56–57.) She alleges that ReVIDA continued to engage in retaliatory conduct when it filed a Counterclaim asserting frivolous and unsupported claims. (*Id.* ¶ 59; *see also* Doc. No. 56, at 12.)

Regarding these allegations, it is undisputed for purposes of summary judgment that, of the fourteen weekly calls between Morris and Dilworth scheduled to take place between the unsealing of the *qui tam* complaint and Morris's termination, two were actually held; three were cancelled by Morris for personal reasons (including her marriage and honeymoon and a "family emergency"[4]); six were cancelled by Dilworth for personal reasons; two others were cancelled by Dilworth due to a Board meeting and a "calendar cancellation"; and one was cancelled due to a holiday. Dilworth offered to reschedule each meeting that had to be cancelled, and Morris declined each time. He also asked her each time he cancelled a call whether she had anything she needed to discuss at the cancelled calls, and she stated each time that she did not. Morris testified that, before the unsealing, the calls took place even if she and Dilworth did not have anything particular to discuss. (Doc. No. 55-5, Morris Dep. 151.) During the November 11, 2022 weekly call that actually took place, one of the topics of discussion was the fact that others could not locate files for which Morris was responsible while she was on leave.

---

[4] Morris takes issue with characterizing a "family emergency" as a "mere personal reason" for cancelling a meeting. (Pl.'s Response to SUF ¶ 9.)Aside from the fact that this is not a material dispute, it seems fairly obvious that a family emergency is quintessentially a personal reason.

Dilworth asked Morris to video record the third-quarter compliance meeting, apparently in September 2022; he had not asked her to do that before. (Doc. No. 55-5, Morris Dep. 164; Doc. No. 55-2, Dilworth Rule 30(b)(6) Dep. 124.) During the same meeting, Dilworth asked Morris if she had any compliance concerns. He also asked others if they had compliance concerns. During compliance meetings, Morris generally asked others if they had compliance concerns, and compliance concerns were always on the meeting agendas, but Dilworth had never asked her bluntly if she had compliance concerns at other compliance meetings. (Doc. No. 56-11, Morris Dep. 168–70.)

Morris claims that she was excluded from discussions related to mergers and acquisitions and a "significant" "financial recap" after the unsealing of the *qui tam* complaint. (Doc. No. 56-17, Morris Dep. 175–77; *see id.* at 177 ("All I know is prior to the unsealing, I was part of conversations. After the unsealing, I was not part of any substantial conversations. And I can't tell you what conversations I was excluded from because I was excluded from them.").) Morris also concedes that she was simply an "active audience" in the conversations about financial recap but was not a participant in the "financial recap" efforts. (*Id.* at 185.)

Prior to the unsealing of the *qui tam* complaint, Morris regularly attended monthly staff management operation reviews ("MOR") calls "when she could and chose to," though she was not required to attend them. (Doc. No. 56-12, Dilworth Dep. 26–27.) After the unsealing of the *qui tam* complaint, Morris was not included on a calendar invitation to attend an MOR on one instance, in October 2022. (*See id.* at 44–45; *see also* Doc. No. 56-26, at 2 (Oct. 18, 2022 email exchange re: same).) She emailed Dilworth and CFO Evan Norton, stating: "If I am supposed to be on a call, it is not on my calendar." (Doc. No. 56-26, at 2.) Dilworth responded promptly, notifying Norton that Morris "should have the option of being on MORs, per usual." (*Id.*)

After the unsealing, Morris was not mentioned or recognized for her efforts in a press release relating to ReVIDA's "Commission on Accreditation of Rehabilitation Facilities" ("CARF") accreditation. (Doc. No. 56-17, Morris Dep. 187–88.)

After the unsealing, Morris perceived that she was "excluded from email exchanges," but it appears the only example she provided was not being included in a single email from a coworker "talking to Mr. Dilworth about the policy concerns while [Morris was] out [on leave]." (Doc. No. 56-17, Morris Dep. 189.)

Aside from these actions, as discussed below, ReVIDA began investigating Morris immediately following the unsealing.

Morris informed ReVIDA that she had filed this lawsuit on November 16, 2022, the day after it was filed. She was terminated on December 5, 2022. ReVIDA filed its Counterclaim on January 17, 2023. (Doc. No. 15.)

### C.    Morris's Alleged Misconduct

Shortly after the *qui tam* complaint was unsealed, ReVIDA began investigating Morris. On or about August 26, 2022, ReVIDA sent a letter to Morris's attorney, reflecting a belief that Morris had misappropriated ReVIDA documents by forwarding them to her personal email account and demanding their return. (FAC ¶ 36; Answer ¶ 36 (stating that the August 26, 2022 letter speaks for itself).) An actual investigation into these practices began, according to Dilworth, within a week after ReVIDA received notice in late August that the government would not intervene. (Doc. No. 56-13, Dilworth Rule 30(b)(6) Dep. 96, 97.) This investigation allegedly revealed that Morris had, in ReVIDA's view, violated its policies and procedures by forwarding documents to her personal email address. (*Id.* at 56–57.) Dilworth testified that it came to his attention in late August 2022 that Morris had sent herself "hundreds and hundreds of pages of [ReVIDA] documents." (*Id.* at

97.) ReVIDA hired outside counsel to investigate Morris. On November 8, 2022, Morris flew to Nashville, with her attorney, and sat through an interview with ReVIDA's outside counsel.

Morris admits that she "may have" "transmit[ted] patient-related data and information" to her personal Gmail account. (Doc. No. 55-5, Morris Dep. 42.) She also acknowledges that it was not "part of [her] day-to-day work to send this information to [her] personal Gmail account." (*Id.*) She does not specifically recall sending patient information, but she did not recall "specifically trying not to . . . either." (*Id.* at 101.) She did not receive patient consent to transmit protected information. She did not send the emails she transmitted to herself to her attorney. There is no evidence that Morris disclosed that patient information to anyone else or that her email account was compromised at any time after the transmission.

Morris forwarded emails from her ReVIDA email account to her personal Gmail account as early as May 2020.

Zachary Talbott testified that ReVIDA employees regularly used Gmail for work-related emails. (Doc. No. 56-16, Talbott Dep. 55.) Talbott was not aware of any "consequences . . . meted out" to employees who emailed ReVIDA documents to their personal email addresses. (*Id.* at 56.) Morris likewise testified that ReVIDA employees commonly used personal email accounts for work-related transmissions. (Doc. No. 56-17, Morris Dep. 48.) Dilworth testified on behalf of ReVIDA that ReVIDA employees are not permitted to use personal email addresses for work matters. (Doc. No. 58-1, Dilworth Rule 30(b)(6) Dep. 61.)

ReVIDA's Operations Manual provides that "E-mail is to be used for business purposes only, during working times. While personal e-mail is permitted, it is to be kept to a minimum. Personal e-mail should be brief and sent or received as seldom as possible." (Doc. No. 56-14, at 2.)

Morris testified that she forwarded emails from her ReVIDA email to her personal Gmail account for work purposes on some occasions, but she did it primarily to document some of the compliance concerns that were the subject of the *qui tam* complaint and out of fear of later retaliation. (Doc. No. 56-1, Morris Dep. 81–82, 86, 96–97, 101–03.) ReVIDA disputes that any of the emails were for a work purpose, pointing to the December 5, 2022 Confidential Memorandum from outside counsel to ReVIDA, documenting a November 8, 2022 interview of Morris, according to which Morris stated during the interview that the emails she sent herself were not for a work purpose and that she did not send any of them to the attorneys representing her in the *qui tam* action. (*See* Doc. No. 58-4, at 4.)[5] Morris denies that she sent herself any company documents for unlawful purposes. (Doc. No. 56-1, Morris Dep. 82; *see id.* at 96 ("There were certain things that I had sent to my attorney and some things I thought I might need to refer to in the event I was retaliated against and

wouldn't have access to those documents.").)

Although ReVIDA does not know exactly what emails Morris either kept or deleted after emailing copies to herself, Dilworth testified that ReVIDA still has access to those documents, as its servers maintain copies. (Doc. No. 56-13, Dilworth Rule 30(b)(6) Dep. 66, 69.)

---

[5] This attorney Memorandum reflects that ReVIDA was considering the impact of the document transmission on the plaintiff's continued employment. The interview appears to have been conducted, at least in part, for the purpose of determining whether the plaintiff's transmission of documents was connected with, or in furtherance of, the *qui tam* action. The Memorandum informed Dilworth that Morris had stated, during the interview, that she did not have a business purpose for sending documents to her Gmail account and that she did not provide the material to the attorneys representing her in the *qui tam* lawsuit. (Doc. No. 58-4, at 4.) The Memorandum states that it "does not contain the mental impressions of counsel and is not made for the purpose of providing legal advice." (*id.* at 2.)

### III.   DISCUSSION

#### A.   The Plaintiff's FCA Retaliation Claims

##### 1.   *Legal Framework*

The FCA makes it unlawful for any person to, among other things, "knowingly present[], or cause[] to be presented, a false or fraudulent claim for payment or approval," and to "knowingly make[], use[], or cause[] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B). The FCA allows the Attorney General or a private individual to initiate a civil action alleging fraud on the government. 31 U.S.C. § 3730(a)–(b). "A private enforcement action under the FCA is called a *qui tam* action, with the private party referred to as the 'relator.'" *U.S. ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 932 (2009).

To protect "whistleblowers" who "pursue or investigate or otherwise contribute to a *qui tam* action, exposing fraud against the United States government," *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 513 (6th Cir. 2000), the FCA also contains an anti-retaliation provision, which provides a cause of action for damages and other relief to any employee who is discharged or otherwise discriminated against "because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter," 31 U.S.C. § 3730(h)(1). To establish a claim under § 3730(h), the plaintiff must prove that (1) she was engaged in a protected activity; (2) her employer knew about it; and (3) the employer discharged or otherwise discriminated against her as a result of the protected activity. *McKenzie*, 219 F.3d at 514.

Retaliation claims under the FCA proceed under the same rules applicable to other employment-related retaliation claims, which means that a plaintiff can prove such a claim by presenting "either direct or circumstantial evidence of a retaliatory motive." *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x. 394, 397–98 (6th Cir. 2015). When a plaintiff relies on indirect

evidence, her claim proceeds under the familiar *McDonnell Douglas* burden-shifting framework. *Id.* at 398 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this framework, the plaintiff must first establish the elements of a *prima facie* case: (1) that she was engaged in a protected activity; (2) that her employer knew that she engaged in the protected activity; and (3) that her employer discharged or otherwise discriminated against the employee "as a result of," or, as the statute states, "because of," the protected activity. *See id.* (quoting 31 U.S.C.A. § 3730(h)(1) ("because of") and *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003) ("as a result of")). Once the plaintiff establishes this *prima facie* case, the defendant bears the burden of producing a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If it does so, the burden then returns to the plaintiff to demonstrate that the defendant's proffered reason is mere pretext for unlawful discrimination. *Id.*

### 2. *Count I – Retaliatory Demotion*

Count 1 of the FAC alleges that the plaintiff engaged in protected activity when she pursued FCA claims against ReVIDA as a relator, that ReVIDA retaliated against her by "demoting her and continued to retaliate against her," as a result of which she suffered economic harm. ReVIDA moves for summary judgment on this claim on the basis that the plaintiff was never demoted and that the facts show, at most, a few isolated actions that, alone or combined, do not amount to demotion or retaliation. The plaintiff responds that the "scrutinization, intimidation, and exclusion" she experienced after the unsealing of the *qui tam* complaint amount to a demotion.

While the plaintiff has not presented any evidence of a demotion, she does not have to in order to establish a retaliation claim. Instead, she must show a materially adverse action. "Employment decisions are only materially adverse if they are reasonably likely to deter employees from engaging in activity protected by the False Claims Act." *U.S. ex rel. Howard v. Lockheed Martin Corp.*, 14 F. Supp. 3d 982, 1021 (S.D. Ohio 2014) (quoting *Boze v. Gen. Elec.*

*Co.*, No. 4:07CV-74-M, 2009 WL 2485394, at *2–3 (W.D. Ky. 2009) (applying Title VII standard to an FCA claim)). On the other hand, anti-retaliation statutes are not intended to protect against "trivial harms" and are not intended to impose "a general civility code for the American workplace." *Id.* (quoting *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)).

As set forth above, the plaintiff alleges that Dilworth rescheduled several of their regular Friday calls (while at the same time offering to reschedule each of them), required her to record the September 2022 third-quarter compliance meeting without advance notice, and then asked her during that meeting if she was aware of any new compliance concerns (a question entirely within her purview and relevant to the meeting topic, even if the plaintiff considered it unusual); that CFO Norton excluded her from a single email invitation to a monthly operations call (which Dilworth promptly corrected when the omission was brought to his attention); that her role in spearheading ReVIDA's CARF accreditation was not acknowledged in a press release; and that she was generally excluded from company discussions relating to new agencies, mergers, and acquisitions (but she does not actually identify particular meetings or conversations from which she was excluded, identify discussions in which she was included prior to the unsealing, or establish that her job included input into any of those types of decisions). The plaintiff argues in her opposition to summary judgment that these actions resulted in a "dramatic shift in job responsibilities" (Doc. No. 56, at 11), but her testimony and the other facts in the record simply do not support that assertion. The court finds that these *de minimis* actions, considered separately or together, either are too vague to support a retaliation claim or are not sufficiently severe to deter or dissuade a reasonable employee from engaging in protected conduct. *Accord Erwin v. Honda N. Am., Inc.*, No. 22-3823, 2023 WL 3035355, at *2 (6th Cir. Apr. 21, 2023) (noting that, while "[t]he showing required in a retaliation case is less burdensome than in a discrimination case," "*de minimis*

employment actions are not materially adverse for purposes of either [type of] claim" (citations omitted)). The defendant is entitled to summary judgment on Count I of the FAC, based on the plaintiff's failure to establish this element of her *prima facie* case.

The matter of the investigation launched into the plaintiff's email practices immediately after the unsealing presents a different question, but the court finds that it is so closely related to the plaintiff's eventual termination that it should be considered within the context of Count II instead of Count I.

### 3. Count II – Retaliatory Termination

As to Count II, there is no dispute that Morris engaged in protected activity when she initiated the *qui tam* action, that the defendant learned of that activity when the *qui tam* complaint was unsealed in late August 2022, and that she suffered an adverse employment action when she was terminated on December 5, 2022. Morris also alleges that she engaged in protected activity when she filed this lawsuit on November 15, 2022, which the defendant learned about the next day, and that the defendant's filing a Counterclaim was in retaliation for her having filed the FAC.

### a) The Parties' Arguments

In support of its summary judgment motion, ReVIDA asserts, in passing, that Morris's "claims" do not establish a *prima facie* case of retaliation, but it does not actually identify which element of the *prima facie* case it disputes. It also argues that, even if Morris could establish a *prima facie* case, she cannot refute ReVIDA's legitimate, non-discriminatory reason for investigating and terminating her. ReVIDA appears to be arguing that the plaintiff was terminated solely because she sent herself hundreds of communications and documents from her company email to her personal email address, in violation of company policy and federal law, and that *that* conduct was not protected activity, because it was not sufficiently related to the *qui tam* action. In

addition, ReVIDA argues that the unauthorized transmission of the emails and documents constitutes a legitimate, non-retaliatory action that the plaintiff cannot refute or call into question.

In her Response, Morris argues that she easily establishes a *prima facie* case, both with respect to her termination and her claim that the counterclaims lodged against her are retaliatory. In a footnote, she asserts that, "clearly[,] filing a lawsuit under the FCA is protected activity, . . . even if that lawsuit is dismissed." (Doc. No. 56, at 8 n.2 (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 762 (2d Cir. 1998) (recognizing the validity of a Title VII retaliation claim based on the filing of a Title VII lawsuit)).) She also asks the court to pay "particular attention" to the "but-for" causation standard that applies to retaliation claims. (Doc. No. 56, at 3 (citing *Bostock v. Clayton Cty.*, 590 U.S. 644, 656 (2020)).) And she asserts that the very close temporal proximity between the defendant's knowledge of her protected activity and the adverse actions, standing alone and considered in the context of the record as a whole, are sufficient at the *prima facie* stage to establish causation.

As for the defendant's legitimate, non-discriminatory reason, Morris argues in scattershot fashion that she presents sufficient proof of pretext to avoid summary judgment. Without much evidence to support many of these arguments, she claims that: (1) ReVIDA knew about her email usage and supposed policy violations when it hired counsel to defend it against the *qui tam* suit and certainly by November 8, 2022, but it did not investigate her until the *qui tam* complaint was unsealed and did not fire her until after she filed this lawsuit; (2) that the defendant "concocted after-the-fact" reasons for terminating her (Doc. No. 56, at 16); (3) the policy on which it relies was not in effect at the time Morris forwarded the emails in question; (4) if ReVIDA believed she had violated patient privacy, it was required to immediately investigate and report such a breach, but it did neither; (5) it "continued" its investigation into her emails "only after she [was] revealed

to be the co-relator and after she . . . voluntarily dismissed the *qui tam* [case]" in October 2022 (*id.* at 17); (6) it treated her and Talbott differently, as he admitted sending emails to his personal email address but has not been sued by ReVIDA; (7) ReVIDA "la[y] in wait for the reason to terminate Morris to come to light" (*id.*); and (8) the punishment for activity that did not harm anyone was "overly severe" (*id.* at 18).

ReVIDA's Reply brief argues that the plaintiff has not shown that the "but-for" standard of causation applies to FCA retaliation claims; she was not demoted or subject to any adverse employment action (other than, admittedly, her termination); filing an FCA retaliation action is not protected activity under the FCA, because it was not "in furtherance of" an FCA action or efforts directed toward stopping an FCA violation; her termination more than two months after the unsealing of the *qui tam* complaint is not sufficiently close in time to give rise to an inference of a causal connection; and Morris fails to establish pretext, in particular because she admits that the emails were not in furtherance of her job or for use in the *qui tam* action.

### b) The Plaintiff's Prima Facie Case

The court finds it unnecessary to decide here whether filing a retaliation lawsuit under the FCA is protected activity.[6] There is no dispute that the plaintiff engaged in protected activity when she filed a *qui tam* complaint, that the defendant knew about it, and that her termination qualifies

---

[6] It likely is, just as filing a Title VII lawsuit constitutes protected activity under Title VII. *See, e.g.*, *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 569 (6th Cir. 2019). The FCA itself forbids "discrimination" "because of lawful acts done by the employee . . . in furtherance of an action under this section." 31 U.S.C. § 3730(h)(1). A retaliation lawsuit under § 3730(h)(1) arguably falls within the scope of "an action under this section," and, as the protection of employees who pursue actions under the FCA is of paramount importance under this provision, construing it as not protecting employees from further retaliatory action after they file a retaliation lawsuit would obviate the benefits afforded by the statute.

as an adverse employment action. In addition, the court finds that the timing of the events is sufficient, at this stage, to give rise to an inference of causation.

Although the Sixth Circuit has not expressly addressed the applicable standard in the FCA context, the "because of" language employed by the FCA is identical to that used in various federal employment discrimination statutes, including Title VII, 42 U.S.C. § 2000e-2(a)(1), and the ADEA, 29 U.S.C. § 623(a)(1). The Supreme Court has confirmed that the "because of" standard "require[s] proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) (construing "because" as used in Title VII's retaliation prohibition); *see also Bostock v. Clayton Cty.*, 590 U.S. 644, 1739 (2020) ("Title VII's 'because of' test incorporates the simple and traditional standard of but-for causation." (quoting *Nassar*, 570 U.S. at 350) (some internal quotation marks omitted). Under this standard, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not . . . engaged in protected activity." *George v. Youngstown State Univ.,* 966 F.3d 446, 459–60 (6th Cir. 2020) (citation and internal quotation marks omitted). This burden is "not onerous" and, at the *prima facie* stage, "can be met through evidence that . . . the adverse action was taken shortly after the plaintiff's exercise of protected rights." *Id.* at 460 (internal quotation marks and citation omitted).

The Sixth Circuit has addressed the relationship between temporal proximity and the *prima facie* element of causation on several occasions and, in *George*, reiterated that, "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation." *George*, 966 F.3d at

460 (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). The court continued:

> In such cases, the adverse employment action is often taken just days or weeks from when the employer learns of the employee's protected activity. But even if enough time passes between the protected activity and the adverse action so as to preclude a finding of causation based on the close timing alone, an employee can still prevail if she couple[s] temporal proximity with other evidence of retaliatory conduct to establish causality.

*Id.* (internal citations and quotation marks omitted). The Sixth Circuit has denied summary judgment in cases where an adverse action took place as long as two to three months after the protected activity. *See, e.g.*, *Kirilenko-Ison v. Bd. of Educ.*, 974 F.3d 652, 664–65 (6th Cir. 2020) (citing *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012), as holding that a lapse of two months was sufficient to show a causal connection based on temporal proximity and *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004), as holding that a lapse of three months was sufficient to show a causal connection based on temporal proximity).

Here, the investigation into the plaintiff's email practices began just a few days after the unsealing of the *qui tam* complaint in late August 2022, led eventually to the plaintiff's meeting with counsel for ReVIDA on November 15, 2022, and culminated in her termination on December 15, 2022. Although the termination did not occur acutely close in time to the unsealing of the *qui tam* complaint (as it took place nearly three months later), the fact that the investigation that led to the termination began within days after the unsealing is sufficient additional evidence to tie the events together, create an inference of a causal connection, and satisfy the causation element of the plaintiff's *prima facie* case. The question, then, is whether Morris can show that the defendant's proffered reason for its action is pretext for retaliation.

> c)     *Evidence of Pretext*

"Generally speaking, an employee can show that an employer's explanation was pretextual in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 320 (6th Cir. 2019) (quoting *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 895 (6th Cir. 2016)). These methods are not exclusive, however. The employee can also demonstrate pretext by offering evidence that challenges the reasonableness of the employer's decision, "to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Id.* (quoting *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009)). In addition, the court must be mindful that at the summary judgment stage, the employee "need not prove that the [employer's] proffered rationale is pretextual" but, instead, "must prove only enough to create a genuine issue as to whether the rationale is pretextual." *Id.* (quoting *Whitfield v. Tennessee*, 639 F.3d 253, 260 (6th Cir. 2011)). At bottom, "pretext is a common-sense inquiry into whether the employer took the adverse employment action for the stated reason or not." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009).

The non-pretextual reason proffered here is that the plaintiff, without authorization and in violation of company policy and patient confidentiality, emailed to herself hundreds of confidential and proprietary documents after the *qui tam* lawsuit was filed, and she has not shown that these documents were transmitted in connection with work-related activity or that they were necessary to the filing of the *qui tam* complaint (as that complaint had already been filed before she began transmitting documents, and she transmitted them to herself, not to her attorney in the *qui tam* action). (*See* Doc. No. 54, at 21 ("Plaintiff was terminated for repeated, excessive, and intentional breaches of confidentiality.").)

The plaintiff's arguments pertaining to pretext are largely unconvincing. She presents no evidence that ReVIDA knew the full extent of her email transmissions until August 2022, that it "concocted after-the-fact" reasons for terminating her, or that it did not reasonably believe that her transmission of emails and documents violated company policy. She has not shown that she was treated differently from any similarly situated employee, as she does not present any employee with whom she was similarly situated.[7] The fact that the investigation continued after she dismissed the *qui tam* case speaks, perhaps, to causation but says nothing about pretext.

At the same time, the chronology of events and the harshness of the plaintiff's treatment are undeniably troubling. Dilworth testified that ReVIDA learned within the week after the unsealing about Morris's sending herself hundreds of emails, and the defendant has not established, on this record, exactly why it began investigating Morris's emails in the first place.[8] And, while it is undisputed that Morris sent herself documents containing confidential information, including confidential patient information, during the pendency of the *qui tam* action, there is no evidence that patient confidentiality was actually breached, that Morris misused any of the

---

[7] She asserts that she is similarly situated to Talbott, who was also a relator in the *qui tam* action. Talbott, however, separated from the company some months before the *qui tam* case was unsealed, and, although Talbott testified that ReVIDA employees regularly used Gmail for work-related emails (Doc. No. 56-16, Talbott Dep. 55), there is no evidence that he forwarded hundreds of ReVIDA documents to his personal email account.

[8] It states in its Memorandum in support of the Motion for Summary Judgment that it uncovered the emails "in complying with the Department[ of Justice]'s investigation" of the *qui tam* allegations (Doc. No. 54, at 2; *see also id.* at 3), ReVIDA does not support that assertion with any citation to the record, did not include this "fact" in its SUMF, and, therefore, did not give the plaintiff the opportunity to respond to that fact. Although Dilworth testified that he did not become aware of the plaintiff's emails until after the *qui tam* complaint was unsealed (Doc. No. 56-13, Dilworth Rule 30(b)(6) Dep. 65–66), ReVIDA asserts in its Memorandum that, at the time it became aware of Morris's actions, counsel was too busy responding to the *qui tam* investigation to also investigate the plaintiff's "subversive actions" (Doc. No. 54, at 3), but it does not support that assertion either. It also includes details about the plaintiff's purported transmission in its Memorandum (*id.* at 12), without including these "facts" in its SUMF.

information, or that she did not reasonably believe the documents might be necessary to protect herself from retaliation. Certainly, she emailed them to herself during the pendency of the *qui tam* action—when she did not know when or whether the government would intervene, what would happen in the course of the investigation, or what would happen to her when the *qui tam* case was unsealed. Moreover, while ReVIDA has pointed to an email policy that purports to limit the use of personal emails for work purposes, it has not actually identified the company policy—or the HIPAA confidentiality rules—that it believes the plaintiff violated.

As set forth above, an employee opposing summary judgment does not "need not prove that the [employer's] proffered rationale is pretextual" but, instead, "must prove only enough to create a genuine issue as to whether the rationale is pretextual." *Babb*, 942 F.3d at 320. To consider whether the plaintiff has satisfied her burden, the court must engage in a "common-sense inquiry," asking whether any jury could believe that the defendant did not take the adverse employment action for the stated reason. In this case, the court finds that there is a question of fact as to whether ReVIDA terminated the plaintiff for the stated reason or, instead, in retaliation for the filing of the *qui tam* action. The defendant is not entitled to summary judgment on Count II of the FAC.

## B.    The Counterclaims

ReVIDA brings counterclaims against Morris for breach of fiduciary duty, conversion, and breach of contract. (Doc. No. 32, at 31–34.) Its Motion for Summary Judgment appears to seek judgment in its favor on each of the counterclaims. (Doc. No. 53.)

### 1.    Breach of Contract

ReVIDA's Memorandum does not reference any contract and instead maintains that Morris "breached" its "Confidentiality Policy and IT Manual." Its SUMF contains no facts related to either. The defendant has not established that a policy or manual constitutes a contract, and its

Memorandum does not even reference Tennessee standards for proving breach of contract. The court finds that ReVIDA is not entitled to summary judgment on its breach of contract claim.

2. *Breach of Fiduciary Duty*

ReVIDA asserts that, under Tennessee law, officers have a duty to act "(1) in good faith; (2) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) in a manner the officer reasonably believes to be in the best interest of the corporation." (Doc. No. 54, at 24 (citing Tenn. Code Ann. § 48-18-403(a)). It asserts that Morris's "breaches of patient privacy" were not in good faith and, even if they were, she exhibited recklessness in the transmission of emails containing confidential patient information, thus breaching her fiduciary duty. *Id.*

To recover for breach of fiduciary duty under Tennessee law, a plaintiff must establish: "(1) a fiduciary relationship, (2) breach of the resulting fiduciary duty, and (3) injury to the plaintiff or benefit to the defendant as a result of that breach." *In re Est. of Potter*, No. W2016-01809-COA-R3-CV, 2017 WL 4546788, at *2 (Tenn. Ct. App. Oct. 11, 2017), *cited in Knox Trailers, Inc. v. Maples*, 581 F. Supp. 3d 1000, 1011 (E.D. Tenn. 2022).

In Tennessee, "employees owe a fiduciary duty of loyalty to their employers." *Comm'rs of Powell-Clinch Utility Dist. v. Utility Mgmt. Rev. Bd.*, 427 S.W.3d 375, 389 (Tenn. Ct. App. 2013). In addition, corporate officers owe a duty of care to act prudently and in the best interest of the corporation. Tenn. Code Ann. § 48-18-403(a). However, even if the court were to presume that Morris's transmission of confidential patient information to her own personal email account violated her fiduciary duty to ReVIDA, the defendant has neither alleged, nor presented facts suggesting, that it was injured or that Morris benefited from the alleged breach. ReVIDA is not entitled to summary judgment on its breach of fiduciary duty claim.

### 3. Conversion

Conversion, under Tennessee law, "is the appropriation of tangible property to a party's own use in exclusion or defiance of the owner's rights." *PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012) (citing *Barger v. Webb*, 391 S.W.2d 664, 665 (Tenn. 1965); *Lance Prods., Inc. v. Commerce Union Bank*, 764 S.W.2d 207, 211 (Tenn. Ct. App. 1988)). Conversion is an intentional tort, and a party seeking to make out a *prima facie* case of conversion must prove: (1) the appropriation of another's tangible personal property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights. *Id.* A conversion claim focuses on "the interference with a property owner's right." *White v. Empire Exp., Inc.*, 395 S.W.3d 696, 720 (Tenn. Ct. App. 2012) (quoting *Gen. Elec. Credit Corp. of Tenn. v. Kelly & Dearing Aviation*, 765 S.W.2d 750, 754 (Tenn. Ct. App. 1988)). "Tangible property" is "chattel." *B & L Corp. v. Thomas & Thorngren, Inc.*, 917 S.W.2d 674, 680 (Tenn. Ct. App. 1995) (quoting Black's Law Dictionary 402 (4th Ed. 1941)). The Tennessee courts "have consistently declined to recognize causes of action for misappropriation or conversion of *intangible* property rights." *Fam. Tr. Servs. LLC v. Green Wise Homes LLC*, No. M2021-01350-SC-R11-CV, --- S.W.3d ---, 2024 WL 3354887, at *15 (Tenn. July 10, 2024) (citations omitted); *see also Ralph v. Pipkin*, 183 S.W.3d 362, 368 (Tenn. Ct. App. 2005) (distinguishing between intangible intellectual property and "tangible personal property that can be seen, felt, weighed and measured").

ReVIDA argues that this court should extend the tort of conversion to cover the emails that Morris allegedly maliciously appropriated "for her own use and benefit." (Doc. No. 54, at 25.) Because conversion is a state law claim, however, this court is bound by the Tennessee Supreme Court's decisions, and that court declined again, little more than a month ago, to extend the tort to cover intangible property. *Fam. Tr. Servs.*, 2024 WL 3354887, at *15. ReVIDA does not argue

that emails qualify as tangible property that can be "seen, felt, weighed and measured." *Ralph*, 183

S.W.3d at 368. Instead, it only argues that other courts applying other states' laws have extended

the tort of conversion to cover the theft of intangible property, including emails. (Doc. No. 54, at

25 (citing *Am. Furukawa, Inc. v. Hossain*, 103 F. Supp. 3d 864 (E.D. Mich. 2015) (applying

Michigan law); *Eysoldt v. ProScan Imaging*, 957 N.E.2d 780, 786 (Ohio Ct. App. 2011) (Ohio

law)).) Both of those cases, however, held that a conversion claim could be based on the theft of

*intangible* property under the laws of the relevant states, at least in some instances. *See Am.

Furukawa*, 103 F. Supp.3d at 866 ("Michigan appellate courts have held that certain intangible

property can be the subject of a conversion action." (quoting *Sarver v. Detroit Edison Co.*, 571

N.W.2d 759, 762 (Mich. Ct. App. 1997)); *Eysoldt*, 957 N.E.2d at 786 ("At common law, the

general rule was that only tangible chattels could be converted. But the law has changed, and courts

have held that identifiable intangible property rights can also be converted." (citations omitted)).

Consequently, they have no bearing here, where the court must apply Tennessee law.

The defendant is not entitled to summary judgment on the conversion claim.

## IV. CONCLUSION

For the reasons set forth herein, the court will grant in part and deny in part the Motion for

Summary Judgment. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge